**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MDC S.p.A,

                               Plaintiff,

       -against-

DAVID SHUMAN

                             Defendant.

No. 19 Civ. 07159 (CM)

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND VERDICT

McMahon, J.:

      The Court, for its findings of fact, conclusions of law, and verdict after a bench trial:

**I.**      **The Parties and the Claims**

      **FF1.**    Plaintiff is an international art gallery based in Milan, with separately incorporated branches in a number of countries, including the United Kingdom. The U.K. branch is incorporated as Carlson, Ltd. and is located in London. The plaintiff gallery will be referred to as MDC or "the gallery."

      **FF2.**    Defendant is a private investor and an experienced and sophisticated collector of modern art, who serves on the Board of the Solomon R. Guggenheim Foundation, which runs the Guggenheim family of museums. He was a significant and valued customer of MDC from about 2010 until 2018, during which time he admittedly purchased approximately 106 paintings from the gallery, at a cost of over $10 million. These works were hung in his homes in New York City and Martha's Vineyard and in his New York City office. Defendant will be referred to as Shuman.

      **FF3.**    Shuman purchased principally through MDC's U.K. gallery. Although Shuman purchased his first work from MDC through its employee Ludovica Barbieri, his principal contact and relationship manager at MDC over the years was Roberto Moiraghi (Moiraghi), who served as the director of the London gallery from at least January 14, 2014 until October 16, 2018, when

1

he summarily resigned from MDC's employ and set up his own competing business in London. Shuman followed Moiraghi to the latter's new venture, of which he is one of Moiraghi's principal customers. He has not purchased any art from MDC since Moiraghi left its employ. He has purchased at least four paintings from Moiraghi since the latter left MDC. (Trial Transcript at 155).

**FF4.** MDC alleges that Shuman purchased eleven artworks from MDC between February 2015 and August 2018 (the disputed artworks), for which he has either not paid anything at all or (in the case of the three works known as LOW-620, LOW-629, and LOW-630) has not paid the full cost of the paintings. These "disputed" paintings are: URA-524, UKL-624, URA-523, LOW-622, URA-536, URA-537, LOW-620, LOW-629, LOW-630, UKL-637, and UKL-638. Plaintiff alleges that there remains an outstanding balance attributable to these eleven works of art totaling $798,133.00.

**FF5.** It is undisputed that Moiraghi created invoices for each of these transactions, caused the gallery to recognize income resulting from these transactions, and in some instances paid the artists their share of the proceeds from these transactions. However, Shuman – backed by Moiraghi – insists that (i) he never purchased nine of the eleven disputed artworks, and (ii) far from still owing a portion of the purchase price for the two paintings that he did purchase, he overpaid for them, and so is entitled to a refund of $25,867. Shuman has asserted a counterclaim for this overpayment; he has also asserted a counterclaim against the gallery for unjust enrichment and pleaded the affirmative defense of offset. (Dkt. No. 17 at ¶¶ 47, 75–81).

**FF6.** Shuman originally also asserted a counterclaim for the gallery's failure to deliver to him a painting by the artist Yan Pei Ming that he purchased in 2017. But the painting (known as PEI-550) has in fact been fully paid for and was delivered to Shuman after the counterclaim was asserted, which is when MDC learned that it had not been delivered to him.

**FF7.** In a pretrial filing submitted on May 27, 2021 – approximately two-and-a-half weeks before trial beginning June 14, 2021 – Shuman purported to assert counterclaims in connection with several of his other transactions with or involving MDC. No claims relating to these allegations are asserted in Shuman's previous pleadings, and Shuman never sought leave to amend his pleadings to add these counterclaims. The Court will construe Shuman's new allegations as an attempt to seek leave to amend his pleadings under Fed. R. Civ. P. 15(a)(2).

**CL1.** Leave to amend is denied. "Obviously, '[u]ndue prejudice arises when an amendment comes on the eve of trial and would result in new problems of proof.' " *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)). In interrogatories served in October 2020, Shuman was asked to about his counterclaims; he admitted in his response to those interrogatories that his only remaining counterclaim was for overpayment for the LOW-629 and LOW-630 paintings – a fact that he confirmed at trial. (Trial Transcript at 180). He is bound by the representations made during discovery and he will not be permitted to add additional claims long after discovery has closed over the plaintiff's objection.

**CL2.** Fed. R. Civ. P. 15(b)(2) does not apply to these claims, because they were not tried on express or implicit consent. Although Shuman discussed these claims in his direct (affidavit) testimony, there is no indication in the trial record that MDC consented to trying these new claims, either expressly or implicitly.[1] The Court will not consider them.

---

[1] These newly asserted claims include claims for (1) an alleged breach of a promise by MDC to sell Shuman a painting back in 2012; (2) a demand that the gallery reimburse for the value of a charitable donation that Shuman made to the Guggenheim in 2014; and (3) a claim for refund of the price that Shuman allegedly paid on an unspecified date for two paintings by an artist that the gallery once represented but no longer represents. The first of these claims is plainly beyond any conceivably applicable statute of limitations. As to the second, there is no evidence in the record – even from Shuman – that the gallery agreed to reimburse Shuman for his donation to the Guggenheim (for which he presumably took a tax deduction). Rather, Shuman testified that he "always felt" that MDC would offer him credit against future purchases as a result of the donation, which he is not able to use since he no longer does business with the gallery. (Trial Transcript at 216). And there is literally no evidence in the

3

## II.     The Governing Law

**CL3.**  Plaintiff's Amended Complaint asserts a claim under New York's Uniform Commercial Code for non-acceptance, as well as common law claims for breach of contract, breach of good faith and fair dealing, and account stated. This constitutes an election that New York law governs this dispute. Until the period allowed for discovery was over and the case was set for trial, plaintiff never asserted that any law other than New York law governed its relationship with Shuman. On May 27, 2021 – two and a half weeks before trial scheduled for June 14, 2021 – plaintiff asserted for the first time that U.K. law governed the disputed transactions. On June 3, the Court ruled that the plaintiff's failure to comply with Fed. R. Civ. P. 44.1 until the eve of trial meant that it had waived any right to assert that foreign law governed this dispute. (Dkt. No. 46).

**CL4.**  The Court has, however, considered whether the United Nations Convention on Contracts for the International Sale of Goods (CISG), rather than the U.C.C., might govern this transaction, as this treaty qualifies as domestic, not foreign, law (United States Constitution Art. VI, Cl. 2). Both plaintiff (an Italian corporation) and defendant (a United States citizen) are citizens of countries that are parties to this treaty.[2]  However, this treaty does not apply to this dispute. The evidence demonstrates that Shuman was not a dealer in art, that he purchased art for his personal use, and that MDC's representatives knew that Shuman was purchasing art for his personal use. Article 2 of the CISG states as follows: the "Convention does not apply to sales: (a) of goods bought for personal, family or household use, unless the seller, at any time before or at the conclusion of the contract, neither knew nor ought to have known that the goods were bought for

---

record about the last of these claims, aside from Shuman's utterly incredible assertion that, by selling him paintings, MDC was somehow agreeing that it would continue to represent the artists whose work he had purchased. (Shuman Affidavit at ¶ 41). These claims were obviously brought up at the last second as a settlement tactic; even if I were inclined to grant Shuman leave to amend (which I am not), I would deny the motion as futile. The fourth newly asserted claim relates to one of the disputed paintings (URA-524) and will be discussed below.

[2]     The United Kingdom is not a party to the treaty, but the U.K. corporation Carlson Ltd. is not a party to this lawsuit.

4

any such use[.]" Therefore, the Court concludes that New York law, the law originally selected by the plaintiff, governs the transactions here at issue.

CL5.    The following legal principles are pertinent to the disputed transactions and will be applied to the facts found by the Court:

(a)    The statute of limitations applicable to sales of goods under the Uniform Commercial Code is four (4) years. N.Y. U.C.C. §2-725.

(b)    Although the statute of limitations for a claim of breach of contract or account stated in ordinarily six (6) years, *see* CPLR 3211(a)(5), when a transaction involves a sale of goods governed by the U.C.C., those doctrines cannot be relied upon to extend the statute of limitations beyond the four-year period. *See, e.g., Herba v. Chichester*, 754 N.Y.S. 2d 695, 697 (N.Y. 3d App. Div. 2003); *Troy Boiler Works, Inc. v. Sterile Techs., Inc.*, 777 N.Y.S. 2d 574, 577 (N.Y. Supp. Ct. 2003).

(c)    There is no basis upon which to toll the statute of limitations or to work any equitable estoppel against Shuman. While, as will be seen, Moiraghi appears to have been a faithless employee, and MDC may well have legal claims against him, there is no evidence that Shuman (as opposed to Moiraghi) misled the gallery in order to prevent MDC from filing a timely action. Moreover, after Moiraghi left the gallery, there was still at least six months (if not more) left on the statute of limitations applicable to the earliest of the disputed transactions. But MDC, for commercial reasons, elected to try to cultivate Shuman's continued patronage rather than bringing an immediate (and timely) lawsuit.

(d)    The so-called "continuing violation" doctrine does not apply to this series of individual purchases of individual works of art. *See Henry v. Bank of Am.*, 48 N.Y.S. 3d 67, 70 (N.Y. 1st App. Div. 2017). Each individual assertion of breach is independent from any other alleged breach.

(e)    In his dealings with Shuman, Moiraghi was the employee and agent of MDC. He was Shuman's point of contact and he concluded Shuman's dealings with the gallery, but he was at all times acting as an employee of the gallery. He was not Shuman's agent within the meaning of the law of agency. "Agency is a legal relationship between a principal and an agent. It is a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." *Faith Assembly v. Titledge of New York Abstract, LLC*, 961 N.Y.S. 2d 542, 550 (N.Y. 2d App. Div. 2013) (citation omitted). There is no evidence that Shuman ever manifested any consent for Moiraghi – an employee of the gallery – to act as his agent in discussions with the gallery.

(f) The doctrine of account stated cannot be used to create an enforceable transaction if the underlying accounts are not themselves enforceable contracts. This is because, "An account stated assumes the existence of some indebtedness between the parties, or an express agreement to treat the statement as an account stated. It cannot be used to create liability where none otherwise exists." *M. Paladino, Inc. v. J. Lucchese & Son Contracting Corp.*, 669 N.Y.S. 2d 318, 319 (N.Y. 2d App. Div. 1998). "[A] claim for an account stated 'cannot be made an instrument to create liability," nor may it "be utilized simply as another means to attempt to collect under a disputed contract.' " *4Kids Ent. Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 249 (S.D.N.Y. 2011) (quoting *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp. Inc*., 567 N.Y.S.2d 404, 408 (N.Y. 1st App. Div. 1991)).

(g) The Statute of Frauds. N.Y. U.C.C. § 2-201 provides, in relevant part:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. . . .

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable . . .

(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Sec. 2-606).

(h) In the absence of any agreement to the contrary, the U.C.C. requires that "payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery." N.Y. U.C.C. § 2-310(a).

## III. Findings of Fact Relevant to All Disputed Transactions

**FF8.** All of the disputed transactions involve artworks that had been consigned to MDC by the artists. Per the terms of their consignment agreements (some of which are in the record as Plaintiff's Ex. E), the artists retained title to their works until such time as the works were sold, at which point the artist's share of the proceeds was paid by the gallery to the artist. (Trial Transcript at 99 (Moiraghi): "The painting still belongs to the artist until the artist is paid."). The works were not consigned in perpetuity, but for a fixed period of time, after which the gallery was obligated to return the consigned work to the artist, who could do with it as s/he wished.

**FF9.**    Shuman testified it was his practice to purchase art from MDC by paying for it in advance and then having it shipped to him. (Trial Transcript at 171, 174). After his initial purchases, he was not sent or given invoices for these purchases; Shuman testified that he and Moiraghi agreed on a price; that he paid the purchase price by wire transfer at the time that agreement was made, and that the artwork was delivered to him thereafter. (*E.g.,* Trial Transcript at 171; Shuman Affidavit at ¶16).

**FF10.**    This testimony is, to say the least, inaccurate. At least from and after January 2014, Shuman did not pay for paintings as he purchased them and prior to shipment. Instead, he sent periodic wire transfers in amounts that sometimes did, but most times did not, correspond to any contemporaneous purchase of artwork. The gallery allocated these wire transfers toward the cost of purchases Shuman had already made. And in at least one instance, the gallery allocated funds wired to it on 9/26/2014 to paintings he purchased subsequently (i.e., to two paintings invoiced on 5/8/2015). (Plaintiff's Ex. T).

**FF11.**    Per Exhibit T (a summary exhibit derived from the gallery's contemporaneous books and records, which were created by or at the behest of Moiraghi, the gallery's director), Shuman purchased a total of 38 paintings during the period January 1, 2014 through August 1, 2018. Shuman agrees that he purchased 29 of those 38 paintings. During that same period, he caused 19 wire transfers (not 29 or 38) to be made to the gallery – 16 from his bank accounts and 3 from a pair of exchange agents who were identified as facilitators of 26 U.S.C. § 1031 "like kind" transactions in art (Yares Art Project and Privarte Inc.). Only two of Shuman's nineteen wire transfers during this period were in the exact amount of a purchase for which he was invoiced at or about the time the wire was sent – the very first transfer that he made, on January 14, 2014, and

a wire transfer made on November 7, 2014, in the amount of $143,998.65.[3] No one disputes that Shuman purchased and paid for both of the paintings. But these are the only paintings purchased during this four-and-one-half-year period for which Shuman transmitted payment to the gallery in the manner to which he testified. To the best of the Court's ability to calculate using MDC's business records, no other wire transfer made by Shuman to MDC equals the amount of any single contemporaneous invoice or any group of contemporaneous invoices that were created by Moiraghi for Shuman's account during the 2014-2018 period. Shuman's testimony about his regular payment practices cannot possibly be credited.

**FF12.** For every transaction attributable to Shuman – actual or disputed – there exists an invoice in the records of MDC. Moiraghi created or caused the creation of invoices for each of the disputed transactions at issue in this lawsuit. He created them or caused them to be created on or about the date shown on the gallery's computerized record of "invoiced artworks London" as the "Created" date. (*See* Plaintiff's Ex. Q). According to Pietro Vallone, MDC's Chief Financial Officer, the "Created" date cannot be changed once it is input into the gallery's computer system. (Trial Transcript at 27).

**FF13.** Moiraghi did not transmit any of the invoices relating to the disputed transactions to Shuman.

**FF14.** Moiraghi testified that he would from time to time create invoices made out to Shuman for paintings that Shuman had not yet agreed to purchase. Moiraghi referred to these transactions as "aspirational," in that he recommended the paintings to Shuman and hoped that his recommendation would result in a purchase. (Trial Transcript at 116). The record does not contain

---

[33] This wire transfer corresponds so closely to the invoiced amount of $144,000 for another painting, LOW-589, that the Court concludes the miniscule difference must be attributable to fees associated with the wiring transaction.

any evidence from which the Court could conclude that Shuman knew about Moiraghi's practice of creating "aspirational" invoices or that he colluded with Moiraghi in any way in the creation of these invoices. Nor is there any specific evidence about which of the invoices Moiraghi created were done for this purpose.

**FF15.**   According to Moiraghi, when he created these so-called "aspirational" invoices, the underlying artwork had not yet been sold. Nonetheless, he included the transaction on the gallery's account log (the list of artworks sold during a particular year), which resulted in the gallery's recognizing income from the "sale," even though, per Moiraghi, no sale had yet taken place. In most but not all of the instances involving the disputed artworks, Moiraghi also caused the gallery to pay the artist his/her share of the non-existent proceeds from the non-sales. (Plaintiff's Ex. D). As director of the London Gallery, Moiraghi signed off on Carlson Ltd.'s Director's Report and Unaudited Financial Statements for each year he occupied that position – specifically for the years ending 31 December 2015 and 2016. (Plaintiff's Ex. F). In those statements, income from all the disputed invoices made out to Shuman was recognized. And in his communications with others at MDC, Moiraghi repeatedly represented that Shuman had in fact purchased the artworks and intended to pay for them. In every respect, it appeared to the plaintiff gallery that Shuman had actually agreed to purchase the invoiced artwork.

**FF16.**   Moiraghi also created invoices in an effort to give MDC what Moiraghi referred to as "optionality" in dealing with a particular artwork. Moiraghi testified that, throughout his tenure as director of MDC's London location, he would "block" certain works that he thought might increase in value over time. He did this by paying the artist the artist's share of what Moiraghi identified on an invoice was the purchase price.[4] This transferred title of the work from the artist

---

[4]   I believe that the artist was paid on a purchase price that was calculated with a 10% discount, even though no purchase had been made and so no discount from the list price had been given to a customer.

to the gallery. (Trial Transcript at 99). "Optionality" allowed the gallery to cut the artist out of any increase in the value of the painting (and profit upon sale) that occurred after the gallery acquired title to the work by paying the artist his or her share of the phony "profit" attributable to the sale that had not yet occurred. As Moiraghi explained, once the gallery owns a painting, it "assume[s] all the risk and all the reward" if the value of a painting increases. (Trial Transcript at 100).

**FF17.** As was the case with "aspirational" invoices, Moiraghi caused the gallery to recognize income as though these paintings had been sold, even though they had not in fact been sold. *See* FF15, *supra*.

**FF18.** Shuman never created any writing or signed any document created by MDC indicating that he agreed to purchase any of the artworks in question. Nor did he create any electronic communication to that effect. In fact, Shuman never seems to have created any writing or email or text, or signed any document, indicating that he agreed to purchase any artwork from MDC. The record contains no writing committing Shuman to the purchase of any artwork, and Shuman and Moiraghi both testified that their dealings were conducted entirely by word of mouth; that was their course of dealing. This means that the only written record of any of Shuman's purchases was the invoice for that purchase – a document that, by its very nature, was not signed by Shuman, and that, per the parties' course of dealing, was not transmitted to him or seen by him.

**FF19.** However, Moiraghi repeatedly represented to MDC – specifically to Massimo De Carlo (the namesake and principal owner of the gallery) and to Claudia Goncalves (the gallery's former Financial Director) – that Shuman had agreed to pay for the purchases represented by the invoices here in dispute. For example:

(a)    On September 30, 2015, Moiraghi asked Claudia Goncalves, in an email the subject of which was "Balances and stuff," to "Get [G]emma [Tomlinson] to print all 2015 invoices," a reference to the Shuman invoices, to which Goncalves said "I have Shuman invoices ready to go through with you so that we can tell Gemma what to print."

(Plaintiff's Ex. J). Tomlinson, the gallery's front desk receptionist at the time, acting on Goncalves's instruction pursuant to this communication, did in fact print a file "with invoices on nice paper" and gave it as a package to Moiraghi (Plaintiff's Ex. K); the employees of the gallery assumed that this was done so that the package could be given to Shuman, although it appears that did not happen. Among the invoices that were so printed were invoices for seven of the disputed artworks: URA-524, URA-523, UKL-624, LOW-620, LOW-622, URA-536, URA-537.

(b)     On April 28, 2016, in response to an email from Claudia Goncalves asking "If you could send any agreement or correspondence with David Shuman, agreeing when the debt will be settled?" Moiraghi replied, "As you know, it is a business where correspondance [sic] is vocal. If you need incan [sic] get with him a written declaration when i see him Next week But would rather not same as above for ukl[.]" (Plaintiff's Ex. M).[5]

**FF20.** Communications of this nature continued and accelerated as Moiraghi, unbeknownst to his employer, prepared to leave his employment with the gallery.

(a)     On September 18, 2018, in response to an email from Massimo De Carlo, the owner of the plaintiff gallery, in which De Carlo said, "Regarding the more urgent things, I need to know in a precise and unmistakable way what kind of instalment [sic] plan was agreed upon with Shuman. . . . it seems to me that the debt is being repaid in a non linear way," Moiraghi replied, "Shuman stopped paying the gallery in September 2015. He made a single transfer to US$200 in 2016. Shuman got out of pandora [sic] in May 2017. From June 2017 to today he has been paying the gallery on a regular basis. He has sent transfers of US$773 and €375 since June 2017 with a clear acceleration in 2018. It is a little over $1.2 million out of an overall debt of a little under 2 million. . . ."

(b)     On October 11, 2018, Moiraghi sent an email to Pietro Vallone, MDC's Chief Financial Officer, in which he explained various transactions, including several of the disputed transactions (*e.g.,* LOW-620, LOW-622) and then represented that he had repeatedly discussed closing Shuman's debt before the end of 2018 with Massimo De Carlo himself.

**FF21.** In none of these communications with his employer or representatives of his employer did Moiraghi state that any of these invoices were not real, or that Shuman had not actually agreed to purchase or pay for the paintings in question. However, Shuman himself neither sent nor received these emails, which were internal correspondences within the plaintiff gallery. To the extent that they contain or imply statements allegedly made by Shuman, they are hearsay

---

[5] The specific reference to the UKL will be explained below in the findings of fact relating to that painting.

within hearsay, and Shuman's alleged statements are admissible only for the fact that Moiraghi made certain representations to his employer – not for the truth of the asserted representations.

**FF22.** Moiraghi testified at trial that the invoices he created at the gallery were not contracts as between MDC and Shuman because, while he was director of the London location, an invoice never created a contract. His position, at least with respect to a valued customer, seems to be that the customer never incurs any legal obligation to pay for a painting, because the transaction can always be reversed as a result of courtesies extended by the gallery to a valued customer. For example, Moiraghi testified that Shuman, as a valued client, was allowed to "cancel invoices" and still have access to the most prized assets by trading or by asking for the gallery to buy back work. (Trial Transcript at 152). Allowing a customer to "live with" a work of art before making a final decision about whether to purchase was also a common courtesy extended by the gallery to favored customers. (Trial Transcript at 122). Moiraghi described these as methods of incentivizing a valued customer to continue purchasing art.

**FF23.** I find it completely credible that Moiraghi could have offered certain "valued customer" concessions to Shuman. However, it is undisputed Shuman never asked Moiraghi to "cancel" an invoice for any reason – including because he decided that he did not want to purchase the work after all.[6] He also never told Moiraghi he wanted to trade one painting for another, and he never told Moiraghi that he wanted the gallery to purchase work back from him. (Trial Transcript at 152). Shuman specifically denied ever asking the gallery to allow him to "live with" a piece before deciding to purchase it. (Trial Transcript at 173). Therefore, none of these standard art world "concessions" to a valued customer has anything to do with this case.

---

[6]  Ludovica Barbieri testified that Shuman returned a painting that was damaged in transit to the gallery and the transaction was cancelled. (Trial Transcript at 88). This does not sound like a special concession made to a valued customer, but a standard business practice followed by reputable businesses when damaged goods are delivered.

**FF24.** It is the Court's finding that Moiraghi extended two and only two courtesies to Shuman of which the latter took advantage. The first was allowing him to purchase works of art without paying for them at the time of purchase, and to pay the debt so incurred by sending periodic wire transfers to the gallery as described above. The second was to allow Shuman to continue acquiring new works of art while he owed money to the gallery.

**FF25.** There is some suggestion in the record that Shuman encountered financial difficulties during the 2014-2017 period; Shuman testified that he closed down his fund and laid off most of his employees at some point during that period. (Tr. Transcript at 191, 194). This might explain his payment practices and the long period of time between 2016-17 when he made almost no payments to MDC at all (as reflected in Plaintiff's Ex. T, Tbl. 4). However, this area of inquiry was not explored at length, so the Court is not able to make any finding in this regard.

**FF26.** It was Moiraghi's practice to allocate Shuman's periodic payments among various paintings that had been purchased by Shuman (Trial Transcript at 162), and he discussed how to allocate payments with Shuman (Trial Transcript at 159).

**FF27.** After Moiraghi left MDC, Ludovica Barbieri, who had originated the gallery's relationship with Shuman and who succeeded Moiraghi as the director of Carlson Ltd, became responsible for Shuman's account – which effectively meant that she became responsible for collecting what the plaintiff's principals believed to be Shuman's debt to the gallery.

**FF28.** Barbieri visited with Shuman in his apartment in New York on December 10, 2018 and asked what Shuman wanted to do about settling the invoices for the disputed works. She did not present Shuman with the invoices at that meeting for business reasons; it was her hope that the gallery could preserve its relationship with Shuman and retain him as a customer despite

Moiraghi's departure. However, the "issue" of what Shuman owed the gallery was discussed generally during that meeting. (Trial Transcript at 79).

**FF29.** Two days later, on December 12, 2018, Barbieri emailed Shuman (copying Moiraghi), enclosing a list of invoices including nine of the artworks in dispute here that had been "sold" to him on or prior to September 23, 2015 but for which full payment had not yet been received: URA-524, UKL-624, URA-523, LOW-622, URA-536, URA-537, LOW-620, LOW-629, LOW-630. (Plaintiff's Ex. V).

**FF30.** Barbieri received no response to her email.

**FF31.** Barbieri's December 12, 2018 email represented the first time that any representative of the gallery transmitted invoices for these nine artworks to Shuman.

**FF32.** On December 23, 2018, January 5, 2019, January 16, 2019, and February 12, 2019, Barbieri sent follow-up emails to Shuman, asking him for a payment plan and the best way to proceed. (Plaintiff's Ex. W, Y).

**FF33.** Shuman did not respond to the first two emails.

**FF34.** On January 25, 2019, Shuman responded to Barbieri's January 16, 2019 email with the following communication: "Hi Ludo, I am working on a =eadline for Feb. 10th…need to sort a few things out by then and will =ontact you to discuss everything. Hopefully will sit down with Rob when =e is back in NY. all my best, David[.]"[7] (Plaintiff's Ex. X).

**FF35.** Shuman responded to Barbieri's February 12 email on the same day as follows: "Thank you Ludo. I am still in the thick of 2 deals and need a =ouple weeks to resolve them…as soon as I do I will call you." (Plaintiff's Ex. Y). The remainder of his email message involved an alleged deal between him and Moiraghi to have MDC deliver a Tauba Auerbach fold painting that

---

[7]    Typos are in the original.

"was collected from my home on MV when the Yan Pei Ming and =owman sculptures were delivered."[8] Shuman wanted Barbieri to arrange for the delivery of the painting to his home in New York City.

**FF36.**  On March 2, 2019 – a "couple of weeks" after receiving Shuman's "need a couple of weeks to resolve them" email, Barbieri sent Shuman a proposed payment plan, which called for the payment of $866,133 to the gallery by December 29, 2019. (Plaintiff's Ex. BB). The payment plan included compensation for two additional paintings that Shuman had allegedly purchased in August 2018 – UKL-637 and UKL-638 – as well as the nine disputed artworks that she had previously discussed with Shuman. This was the first time that that any representative of the gallery transmitted invoices for UKL-637 and UKL-638 to Shuman.

**FF37.**  Also attached to this email was a document entitled "Outstanding Invoices," which showed the invoice date, the invoice amount, the receipt of any installments, the amount outstanding, and the delivery status of the artwork. (Plaintiff's Ex. BB). The documents showed that, in the gallery's records, $118,717 of payments previously received from Shuman had been allocated to LOW-620, $165,000 to LOW-629, and $142,150 to LOW-630. There is no indication on the document that payment had been allocated to any of the other disputed paintings.

**FF38.**  On the same document, LOW-629 and LOW-630 are shown as having been delivered to Shuman on March 31, 2016 and February 1, 2016, respectively. UKL-624 and URA-523 are shown as having been delivered to Shuman's storage on June 18, 2015. There is no indication that any of the other disputed paintings were ever delivered to Shuman. All four of these paintings are presently in Shuman's custody.

---

[8]    Typos are in the original. The Auerbach painting was not purchased from MDC. (Trial Transcript at 154).

**FF39.** At no point in their correspondence did Shuman state that he had not purchased the disputed paintings. He never denied to any representative of MDC, orally or in writing, that he owed the gallery money. He did not assert that he had made full payment for LOW-629 and LOW-630, or that the money shown as allocated to LOW-620 was actually intended for any other painting, including LOW-629 or LOW-630. He did not assert that he had paid any portion of the purchase price of URA-524. He did not assert that any paintings that were ostensibly delivered to him had in fact not been delivered to him. Rather, Shuman's emails of January 25 and February 12, 2019 indicate to this trier of fact that Shuman understood and acknowledged that he owed money to the gallery at that time, and that he needed to close out a couple of deals before he could (or would) make payment. However, Shuman's statements are general in nature and not attributable to any specific work of art that had been invoiced to him by Moiraghi.

**FF40.** When Shuman responded to Barbieri's January 16 email (which he did on January 25, 2019) and when he responded to her February 12 email (which he did on February 12, 2019) – in each case indicating that payment for the disputed artworks would not be immediately forthcoming and refusing to commit to any sort of schedule – there was ample time for the gallery to bring a timely lawsuit to recover payment for all of the disputed artworks. That the gallery did not do so, but gave Shuman additional time to propose or agree to a payment schedule, represents a business decision on the part of the gallery; the gallery was not wrongfully induced by anyone to sleep on its rights.

**FF41.** A demand letter was finally sent to Shuman on April 24, 2019 – at which point there was still plenty of time to bring a timely suit to recover payment for all but one of the disputed artworks.

**FF42.** This lawsuit was finally filed on July 31, 2019. (Dkt. No. 1).

## IV.    Findings of Fact and Conclusions of Law Relating to URA-524

**FF43.**  An invoice relating to URA-524 was created by Moiraghi on February 19, 2015. (Plaintiff's Ex. A). By its express terms the invoice was payable on receipt. Had the invoice been given to Shuman at the time of an alleged purchase to which Shuman had agreed, this would have constituted an agreement on when payment was due that would have superseded the default provision of the U.C.C.

**FF44.**  The credible evidence indicates that the invoice was never sent or transmitted to Shuman until Barbieri emailed it to Shuman on December 12, 2018 – more than three years after the invoice was created.

**FF45.**  There is no evidence that the painting was delivered to Shuman, although Moiraghi caused the artist to be paid for the painting. (Plaintiff's Ex. D).

**FF46.**  There is no document signed by the party to be charged (Shuman) indicating that he purchased this painting.

**FF47.**  The invoice for this painting was one of the invoices created by Moiraghi to facilitate the acquisition of title to the painting by the gallery prior to its ultimate sale.

**FF48.**  The credible evidence suggests that Shuman never agreed to purchase this painting and I so find.

**FF49.**  As one of his eve-of-trial counterclaims, Shuman asserted that he paid $26,000 toward the purchase of URA-524, which he now wants refunded. (Shuman Affidavit at ¶ 36). This testimony contradicts Shuman's Answer, in which he generally denied all of MDC's allegations, (including allegations with respect to URA-524) and did not affirmatively assert that he ever paid any money toward the purchase of URA-524 (a compulsory counterclaim that he would have had to plead, *see* Fed. R. Civ. P. 13(a)). Moreover, Shuman offers no evidence to support this last-second contention; for example, he points to no check or wire transfer that he supposedly sent to

pay for this this painting. And nothing in MDC's business records indicates that Shuman ever paid anything toward this painting. I thus consider Shuman's statement that he paid a portion of the purchase price of this painting to be a recent fabrication invented for settlement purposes, and I do not credit it. The only reason I have discussed this specific "newly asserted" claim is that it relates to one of the paintings in dispute in this lawsuit.

## V.   Findings of Fact and Conclusions of Law Relating to UKL-624 and URA-523

**FF50.**  Moiraghi created invoices relating to these paintings: "Untitled (Blood Joke)" by Piotr Uklański (UKL-624) and "Gastarbeiter" by Andra Ursuta (URA-523) on or about May 20, 2015. (Plaintiff's Ex. A). The invoices indicated that UKL-624 was sold for $128,000 and that URA-523 was sold for $40,000.

**FF51.**  These invoices were never sent or transmitted to Shuman until Barbieri emailed them to Shuman on December 12, 2018, more than three years after they were created.

**FF52.**  There is no document signed by the party to be charged (Shuman) indicating that he purchased these paintings.

**FF53.**  The artist was paid for UKL-624, which is by far the more expensive of these two artworks. The artist was not paid for URA-523. (Plaintiff's Ex. D).

**FF54.**  According to MDC's records, both of these paintings were delivered to Shuman's storage on or about June 18, 2015. From and after that date, Shuman has had custody of both paintings. Shuman admits that he found the paintings in his storage; he contends that he was not aware that the paintings had been shipped to him until after this lawsuit began, and he specifically avers that he does not want the paintings. (Trial Transcript at 211–12).

**FF55.**  As other findings of fact make clear, I believe that Moiraghi sometimes used Shuman – a valued customer for whom the gallery would make concessions, including cancellation privileges – as a "front" for his "optionality" purchases (since the invoices that allowed Moiraghi

to pay the artists had to be made out to someone). However, I do not believe that the invoices for these two paintings were "optionality" invoices. Of the nine paintings Shuman now claims not to have purchased, the gallery's records show that only these two paintings were sent to Shuman – there is no evidence that the other seven disputed works were ever removed from MDC's inventory. Therefore, either Shuman agreed to purchase these two paintings in 2015, or Moiraghi created "aspirational" invoices for them and then sent the paintings to Shuman in the hope that transactions would ultimately be concluded. Since both Moiraghi and Shuman testified that Shuman did not buy the paintings, and since there is literally no evidence other than the undelivered invoices that he did, I conclude that Moiraghi created aspirational invoices for these paintings and shipped the paintings to Shuman in the hope (and probably the expectation) that Shuman would ultimately purchase them.

**FF56.**  Shuman did not in fact agree to purchase these paintings. However, they are presently in his custody. Since he has testified, credibly, that he does not want the paintings, he must return them to MDC forthwith.

## VI.  Findings of Fact and Conclusions of Law Relating to LOW-622, URA-536, and URA-537

**FF57.**  Moiraghi created the invoices associated with these three artworks on or about June 22, 2015. (Plaintiff's Ex. A). He caused the artists to be paid for LOW-622 and URA-537, but not for URA-536. (Plaintiff's Ex. D).

**FF58.**  The credible evidence indicates that these invoices were never sent or transmitted to Shuman before Barbieri's email to Shuman on December 12, 2018, more than three years after the invoices were created.

**FF59.**  There is no evidence that the paintings were delivered to Shuman.

**FF60.** There is no writing signed by the party to be charged (Shuman) indicating that Shuman ever agreed to purchase any of these paintings.

**FF61.** The Court concludes that the invoices for LOW-622 and URA-537 were "optionality" invoices created by Moiraghi for the purpose of acquiring title to the paintings for the gallery.

**FF62.** There is no evidence that Shuman agreed to purchase any of these paintings, and I find that he did not do so.

**CL6.** Even if Shuman did orally agree to purchase any of these paintings, any claim for payment is barred by the statute of frauds. *See* N.Y. U.C.C. § 2-201.

## VII.    Findings of Fact and Conclusions of Law Relating to LOW-620, LOW-629 and LOW-630

**FF63.** Moiraghi caused an invoice to be created for LOW 620 (a Nate Lowman "Ceiling Painting") on or about June 22, 2015.

**FF64.** The work was neither delivered to Shuman nor placed in storage for Shuman, and the invoice was not transmitted to Shuman before Barbieri's email to Shuman on December 12, 2018, more than three years after the invoice was created.

**FF65.** The artist was not paid for this painting. (Plaintiff's Ex. D).

**FF66.** There is no writing signed by the party to be charged (Shuman) indicating that Shuman ever agreed to purchase LOW-620.

**FF67.** Moiraghi caused invoices to be created for LOW-629 and LOW-630 (the Smiley Face Paintings) on or about September 23, 2015.

**FF68.** LOW-630 was delivered to Shuman in the United States on February 1, 2016 and LOW-629 was delivered to Shuman in the United States on March 31, 2016. The paintings have remained in Shuman's possession continuously since they were delivered.

**FF69.** Shuman admits that he purchased LOW-629 and LOW-630. He contends that he has paid for them in full and then some. He asserts that he did not purchase LOW-620 and he has never alleged that he made any payment toward that painting.

**FF70.** Each side advances its own version of how payment was made for LOW-629 and LOW-630.

**FF71.** Shuman testified that he sent approximately $425,000 to the gallery "over a series of payments" and that he and Roberto agreed to allocate those payments to LOW-629 and LOW-630. (Trial Transcript at 188). He was not able to identify which wire transfers those might be. However, Shuman did recall that:

> some of the money from one of the 1031 exchanges was allocated to one of the Ceiling Paintings [that would be LOW-620, a painting that Shuman denies having purchased] because Nate [Lowman] had not finished the Smiley paintings yet and you could not allocate 1031 proceeds to a painting that did not exist. So it was allocated to the Ceiling Painting [a painting Shuman claims not to have purchased] with the understanding that it would be traded for the Smiley Face painting.

(Trial Transcript at 183).

**FF72.** Shuman's testimony that he directed the gallery to credit him for partial payment for a painting that he did not want to buy and had not agreed to buy is inherently incredible – as is his contention that "he and Roberto agreed" to allocate more money toward LOW-629 and LOW-630 than those paintings cost. But Shuman's story is also impossible. MDC's records show that LOW-629 and LOW-630 were delivered to Shuman in March and February of 2016, respectively. There is no contradictory evidence in the record. Paintings cannot be delivered before they are finished. The 1031 proceeds were not wired to the gallery by Yares Art Project and Privarte until March and November 2017. (Plaintiff's Ex. T). Therefore, it is not possible that any portion of the 1031 proceeds was "parked" temporarily pending completion of one of the Smiley Face Paintings

by having MDC falsely claim that the money was attributable to LOW-620, a painting Shuman really did not want to buy.

**FF73.** MDC's view of the matter of payment for these paintings is different. MDC's records indicate that Moiraghi allocated sums over time to the purchase of LOW-620, LOW-629 and LOW-630, as follows:

(a)   LOW-620 (invoiced 6/22/2015) – $80,000, representing the entire proceeds of a wire transfer received on or about 5/31/2018; $38,717, representing the proceeds of a €100,000 wire transfer received on or about 8/1/2018.[9] The total amount allocated toward the purchase of this painting is $118,717, against a purchase price of $160,000.

(b)   LOW-629 (invoiced 9/23/2015) – $74,898.20, representing the entire proceeds of a wire transfer received on or about 11/9/2015 (credited for $75,000); and $90,000, representing the entire proceeds of a wire transfer received on or about 7/21/2017. The total payment allocated toward the purchase of this painting is $165,000 against a purchase price of $200,000.

(c)   LOW-630 (invoiced 9/23/2015) – $6,150, representing a portion of the proceeds of a wire transfer in the total amount of $83,974.03, received on or about 9/26/2014;[10] $56,000, representing a portion of the proceeds of a wire transfer of $199,989.86, received on or about 1/19/2016; $25,991.24, representing the entire proceeds of a wire transfer received from a 1031 exchange facilitator (Yares Art Project) on or about 3/14/2017; $34,000, representing a portion of the proceeds of a wire transfer in the total amount of $303,990, received from a 1031 exchange facilitator (Privarte Inc.) on or about 11/1/2017; and $19,990.43, representing the total amount of proceeds from a wire transfer received for a 1031 exchange facilitator (Privarte Inc.) on or about 11/29/2017. The total payment allocated toward the purchase of this painting is $142,150 against a purchase price of $200,000.

**FF74.** There are, of course, more logical ways in which one could attribute particular funds to the purchase of these paintings. For example, the wire transfer in the amount of $199,998 (i.e., $200,000), made on January 19, 2016, was made shortly before the delivery of the first of the

---

[9]   MDC's records indicate that the rest of this €100,000 wire was allocated as partial payment for another painting, PEI-550. (Plaintiff's Ex. T).

[10]  It appears that there was money left over from this 9/26/2014 wire transfer after allocating it toward the purchase of at least 4 paintings that were invoiced on 7/7/2014. The leftover money was retroactively allocated to the purchase of at least three paintings invoiced after the date of the wire transfer, one of which was LOW-630. (Plaintiff's Ex. T).

two Smiley Face Paintings to Shuman (LOW-630); logically, one might assume that Shuman was paying for that painting in full (which would mean that he paid nothing for the other Smiley Face painting (LOW-629)). However, there is no credible testimony or other evidence in the record that would support such a finding; neither Shuman nor a representative of the gallery testified that this was the case, so any such finding would be pure speculation on my part. I am thus left to choose between Shuman's utterly unbelievable story about parking funds temporarily to effectuate a 1031 exchange for an "unfinished" painting that had been delivered to him more than a year earlier and the gallery's records. I choose to credit the gallery's records.

**CL7.** MDC is owed $35,000, with interest accruing beginning the date of delivery of March 31, 2016 for LOW-629; and $57,850, with interest accruing beginning the date of delivery of February 1, 2016, for LOW-630.

**FF75.** As for LOW-620: the unusual circumstances of MDC's belated (by three years) allocation of funds toward the purchase of this painting (which occurred in the run-up to Moiraghi's departure from the gallery) – coupled with the fact that the painting was never delivered and the artist was not paid for it – indicate to the Court that Shuman did not in fact agree to purchase this painting; that the invoice created by Moiraghi in 2015 was an "aspirational" invoice; and that Moiraghi, who was about to leave MDC's employ, was trying to cover his tracks with his employer by belatedly allocating funds received from Shuman toward the purchase of this painting. There is no credible evidence that Shuman ever agreed to purchase LOW-620.

**CL8.** The fact that there is no writing signed by Shuman indicating that he purchased the painting, and that the painting was never delivered to Shuman, means that even if Shuman did orally agree to purchase LOW-620, the gallery's claim would be barred by the statute of frauds. N.Y. U.C.C. §2-201.

**CL9.** Shuman did not overpay for LOW-629 and LOW-630; he underpaid for them. However, because Moiraghi allocated funds received by Shuman to the purchase of LOW-620, which Shuman did not buy and as to which the gallery has no enforceable claim for payment, Shuman has actually proven a claim for unjust enrichment in respect of this painting. In New York, unjust enrichment requires: "that the defendants were enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendants to retain what is sought to be recovered." *County of Nassau v. Expedia, Inc.*, 992 N.Y.S. 2d 293, 296 (N.Y. 2d App. Div. 2014). "The essence of unjust enrichment is that one party has received money or a benefit at the expense of another." *Ibid*. (citation omitted). The gallery has been unjustly enriched by improperly allocating funds received from Shuman towards a painting that he did not agree to purchase and that is still in the gallery's possession.

**CL10.** While Shuman did not assert a counterclaim for this sum, and while it is not the precise "unjust enrichment" claim that Shuman pleaded in his Answer,[11] the parties implicitly agreed to try this claim. As one of its claims, MDC affirmatively asserted that Shuman had purchased LOW-620 and did not fully pay for it. But the evidence offered to support its claim of partial payment – MDC's own business records – prove, not that Shuman purchased the painting, but that Moiraghi credited payments made by Shuman toward the purchase of a painting that was invoiced only "aspirationally." The Court thus deems the pleadings amended to conform to the proof, *see* Fed. R. Civ. P. 15(b)(2), and finds that Shuman is owed a refund in the amount of (i) $80,000 plus interest from May 31, 2018, and (ii) $38,717 plus interest from August 1, 2018.

---

[11] In his answer, Shuman pleaded an unjust enrichment counterclaim, but in the amount of the alleged overpayment for LOW-629 and LOW-630 – not the amount credited toward the purchase of LOW 620.

## VIII. Findings of Fact and Conclusions of Law Relating to UKL-637 AND UKL-638

**FF76.** Moiraghi created or caused to be created invoices for these paintings on or about December 20, 2016. I will refer to these as the "original invoices." Each painting was invoiced in the amount of $128,000.

**FF77.** The original invoices were not made out to Shuman. They were made out to his brother Michael Shuman, and his sister-in-law Alexandra Shuman, who are not collectors of modern art. (Plaintiff's Ex. N, *see* especially Bates No. P-000126 and P-000128).[12]

**FF78.** The address on the original invoices is not the address that appears on the other invoices made out to Shuman. Shuman testified that it was also not the address of his brother and sister-in-law, but of another American art collector who is not a party to this case and not related to any party in this case. The Court has directed that the address be redacted from publicly filed versions of the trial transcript, and that the names of the non-parties be redacted in the official transcript of proceedings that is publicly filed.

**FF79.** There is no document signed by the party to be charged (Shuman) indicating that he purchased these two paintings.

**FF80.** There is no evidence that UKL-637 and UKL-638 were ever delivered to Shuman.

**FF81.** The original invoices were never delivered to Shuman.

**FF82.** Moiraghi caused the artist to be paid for UKL-637 and UKL-638.

**FF83.** As was the case with URA-524, LOW-622, and URA-537, I conclude that Moiraghi's invoices were created as part of his "optionality" program, in order to pay off the artist and have the gallery acquire title to these two paintings. I do not believe that Shuman ever agreed

---

[12] Plaintiff's Ex. N are actually reprints of the original invoices and were created on or about August 3, 2018 for the purpose of cancelling the original invoices so the invoices for the paintings could be remade in the name of David Shuman. There is no dispute between the parties that invoice numbers 185/2016 and 186/2016 were created for a dummy account of Shuman's brother and sister-in-law.

to purchase them; and Plaintiff has not proved by credible evidence that Shuman ever asked Moiraghi to make out invoices in the name of his brother and sister-in-law.

**FF84.** Moiraghi was asked about these particular invoices on several occasions by representatives of his employer. His story was that Shuman had asked that the invoices be made out to his brother and sister-in-law for reasons having to do with his financial condition (Plaintiff's Ex. O), but that Shuman had in fact agreed to purchase the paintings. One such communication was punctuated with a "hahahahah" (fake laugh). (Plaintiff's Ex. H).

**FF85.** Shortly before his departure from the gallery, Moiraghi made efforts to cover his tracks with respect to some of the invoices that he had made out to Shuman even though Shuman did not agree to purchase the work. One such effort was his very belated allocation of funds to LOW-620. *See* FF75, *supra*. A second such effort was Moiraghi's cancellation of the original invoices for UKL-637 and UKL-638, replacing them with invoices made out to Shuman at his usual Park Avenue South address. These invoices were created on or about August 30, 2018. (Plaintiff's Ex. N).

**FF86.** Moiraghi's last minute invoices were not sent to Shuman at or about the time they were created. They were simply put into the gallery's electronic records. The invoices were first transmitted to Shuman by Ludovica Barbieri (who had no reason to know that they were not real invoices) on or about March 2, 2019.

**CL11.** The gallery has no claim for breach with respect to these paintings because Shuman never agreed to purchase them.

**CL12.** Even if Shuman had orally agreed to purchase ULK-637 and UKL-638, MDC's claims for payment are barred by the statute of frauds. N.Y. U.C.C. § 2-201.

## IX.    Findings of Fact and Conclusions of Law Relating to Claims for Miscellaneous Items

**FF87.**  MDC originally also asserted miscellaneous claims for "$798,133.00 [the cost of the disputed artworks] plus related expenses, including the costs of storage, interest, attorney's fees and costs of suit." (Dkt. No. 9). Shuman, in his pleading asserting his original counterclaims, also requested miscellaneous relief including attorney's fees. (Dkt. No. 17). He also asserted the counterclaim for the painting known as PEI-550.

**FF88.**  With respect to the painting labeled PEI-550, Shuman has paid for the painting and it has been delivered to him. He has introduced no evidence that he suffered any damage as a result of the belated delivery. He thus has received all the relief to which he is entitled. The counterclaim is dismissed.

**FF89.**  MDC represented in its amended proposed findings of fact and conclusions of law that it is no longer seeking a claim for storage costs "as part of the instant suit." (Dkt. No. 53, Ex. 2 at 17). That aspect of its claim is dismissed as abandoned.

**CL13.** The parties' requests for attorney's fees are denied, given the customary American rule requiring each party to bear its own legal fees. *See generally Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 257–59 (1975).

## CONCLUSION

The Clerk of Court is directed to enter judgment as follows:

In favor of Plaintiff in the amount of $35,000 for Defendant's failure to remit full payment for LOW-629 by the delivery date of the painting on March 31, 2016, plus pre-judgment interest at 9% (accruing beginning March 31, 2016 and running through June 30, 2021) in the amount of $16,543.97, for a total amount of $51,543.97.

In favor of Plaintiff in the amount of $57,850 for Defendant's failure to remit full payment for LOW-630 by the delivery date of the painting on February 1, 2016, plus pre-judgment interest

at 9% (accruing beginning February 1, 2016 and running through June 30, 2021) in the amount of $28,186.42 for a total amount of $86,036.42.

In favor of Defendant in the amount of (i) $80,000 plus pre-judgment interest at 9% (accruing beginning May 31, 2018 and running through June 30, 2021) in the amount of $22,211.51, and (ii) $38,717 plus pre-judgment interest at 9% (accruing beginning August 1, 2018 and running through June 30, 2021) in the amount of $10,157.64, for a total amount of $151,086.15.

These amounts shall be set off against each other, such that the net amount that MDC must pay to Shuman is, as of June 30, 2021, $13,505.76;

Otherwise dismissing Plaintiff's claims;

Ordering Shuman to return the paintings identified as UKL-624 and URA-523 to MDC within fourteen days;

Dismissing Defendant's counterclaim for the gallery's failure to deliver of PEI-550;

Denying Defendant's belated effort to assert additional counterclaims; and

Directing each side to bear its own costs.

and is further directed to close the file in this case.

Dated: June 30, 2021

_____
United States District Judge

BY ECF TO ALL COUNSEL